## RICHARDSON *v.* THE STATE.

RUSSELL, C. J.  1.  There is no merit in the two grounds of the motion for a new trial in which it is insisted that the court violated the provisions of section 4863 of the Civil Code by expressing or intimating an opinion as to what had or had not been proved in the case or as to the sufficiency of the evidence; but this court does not approve of the remark made by the trial court to counsel for the accused, which appears in the first ground of the motion.

2. The court did not err in not charging the jury upon the subject of manslaughter.

3. The court having correctly ruled that the question which the solicitor-general sought to propound was inadmissible, his failure to rebuke the solicitor-general does not require the grant of a new trial.

4. The court did not err in overruling the ground of the motion for a new trial based upon alleged newly discovered evidence, the same being merely cumulative and impeaching of the testimony previously adduced upon the trial.

5. The evidence was sufficient to support the verdict, and there was no error in refusing a new trial.

*Judgment affirmed. All the Justices concur, except Russell, C. J., dissenting.*

No. 4931.  JANUARY 25, 1926.

---

Criminal Law 16 C. J. pp. 831, n. 69, 74; 1143, n. 14; 1199, n. 56; 1202, n. 70: 17 C. J. p. 252, n. 16.

Homicide 30 C. J. pp. 310, n. 25; 406, n. 17.

Murder. Before Judge Wright. Chattooga superior court. May 18, 1925.

The plaintiff in error was indicted for the offense of murder. He was convicted. He moved for a new trial, and excepted to the judgment overruling his motion. It appears from the evidence that the accused, in endeavoring to shoot J. H. Holmes, his father-in-law, shot and killed Osburn Holmes, son of J. H. Holmes. The wife of the accused had an infant child, generally believed to have been begotten by J. H. Holmes, who had been convicted of incest on account of his incestous intercourse. The quarrel started on account of the accused giving the child whisky to drink, and J. H. Holmes objected thereto. The evidence is conflicting as to the exact location of the parties at the time of the quarrel and homicide. The accused based his motion upon the three usual general grounds, and by amendment complained of four alleged errors. As a fifth ground he relies upon evidence alleged to be newly discovered. In the first special ground of the motion it is assigned as error that the court expressed and intimated to the jury his opinion that the defense offered by the defendant was weak, and that movant and his counsel had been laboring and struggling to build up a defense; and that this was highly prejudicial in this case, in view of the fact that he had introduced only his statement and a certified copy of certain criminal proceedings against the main witness for the State. As appears from the record, State's counsel objected to the admission of any testimony from the witness Dr. F. W. Hall, with this statement: "Now, if your honor please, the rule was invoked, and this witness has been sitting in the court-room listening to the evidence, and I object to the admission of any testimony from him." "Mr. Taylor [defendant's counsel] : If your honor please, we did not call Dr. Hall as a witness, and the matter I want to introduce him about is a matter which has just been called to my attention." "The Court: Well, go ahead and use him; you seem to be fishing anyhow." It is insisted that the use of the phrase "you seem to be fishing anyhow," made in the presence and hearing of the jury, was error upon the part of the trial judge, in that he thereby intimated and expressed an opinion to the jury as to what had or had not been proved, in violation of section 4863 of the Civil Code. "And movant charges that the court by said remark expressed and intimated to the jury

that in his opinion the defense offered by the defendant was weak, and that movant and his counsel had been laboring and struggling to build up a defense, which in itself was weak."

In the second special ground of the motion a similar exception is presented, arising out of a question asked by the judge. "During the direct examination of Dr. F. W. Hall, practicing physician, after the said Hall had testified to an examination of the defendant, and of certain injuries that he found on his ankle and legs, the following occurred: Q. (By Mr. Taylor of counsel for the defendant) Could this have been caused by falling through the porch or flooring, something like that? A. It could have been; yes, sir. Mr. Kelly (solicitor-general): I move the court to rule that out. It has absolutely no connection with the case—there is no proof that this injury was caused by him falling through a hole in the floor, or any other hole that he fell through. The Court: Did you say he had an abrasion on both legs? Witness: Yes, sir." Movant contends this was prejudicial error against him on the part of the court, for the reason that part of the defendant's defense was that the decedent, Osburn Holmes, was shot by this defendant accidentally, when deceased ran into defendant as he was backing out of the house of J. H. Holmes, and on to the porch of the said house, and just as one of his feet went through a hole on the porch, throwing him forward and accidentally discharging his gun, and it was in corroboration of his contention that one foot fell through this hole that the testimony of Dr. Hall, to the effect that he had an abrasion on that leg just after he was placed in jail, was introduced; and the examination of the witness by the court, to the effect that there was an abrasion on both legs, without a further examination on the part of the court to ascertain whether or not the injuries on both legs were of the same nature and character, whether of the same age, their corresponding locations, was an intimation and expression of opinion on the part of the court to the effect that there was no merit in the defendant's contention that he fell through the hole in the porch and that the fatal shot was an accident resulting therefrom; and movant says further that the examination of the witness by the court was an unnecessary and unwarranted departure from the province of the presiding officer and a like invasion of the province of the trial attorney, and the defendant assigns error thereon."

In the third special ground of the amended motion complaint is made that the court erred in failing to charge the jury the law of manslaughter as contained in section 64 of the Penal Code. In the fourth ground complaint is made that the court allowed the solicitor-general to state to the court, in the presence of the jury, what he intended to prove by the witness J. H. Holmes, the same being clearly inadmissible, without reprimanding the solicitor-general for so doing, and without then and there instructing the jury with reference to that remark, and without instructing the jury not to consider the statement made by the solicitor-general. The solicitor-general was evidently attempting to get before the jury something which would convince them that the State's witness had not been properly convicted, or was innocent, of the charge of incest upon which he had been convicted, and the record of which was before the jury. What transpired in relation to this matter can best be stated from the record as certified by the trial judge. "When, upon and during the progress of the trial of said case, J. H. Holmes was recalled as a witness for the State in rebuttal to the defendant's defense, the following occurred: Solicitor Kelly: 'Now, if your honor please, right at this time, since the defendant has made a statement, and since the defense has introduced this bill, I want to put Mr. Holmes back on the stand, and show that this was brought about—that that prosecution at that time, show that it was malicious, and that the witnesses who swore against him later told him that they were sorry about it.' The Court: 'He could not swear to what one of the witnesses told him.' Solicitor Kelly: 'I just want to prove that these same witnesses that testified against him there have recently told him that they were sorry of it.' Mr. Taylor: 'I object to that; and I further object to the solicitor stating it in the presence of the jury; it can not be done.' Court: 'No, that is not permissible, Mr. Solicitor.' Solicitor Kelly: 'I beg your pardon.' And then, when the direct examination of Mr. Holmes in rebuttal began, the following occurred: 'Q. Mr. Holmes, you had a trial up in Walker? Mr. Taylor: 'Your honor please, I object to any oral testimony relative to this trial in Walker County. There is better evidence.' Court: 'I will let him testify as to whether he was guilty or not guilty, and not go into what the witnesses swore about this and that, and everything else that occurred on the trial.' Solicitor Kelly: 'Will

your honor permit me to show the reasons they testified that way for, and the circumstances that brought it about?' Court: 'No, I can not do that.' Movant contends this statement of the solicitor-general about what he intended to prove by the witness Holmes, made in the presence of the jury, was error prejudicial to the movant, in that it stated matter that was inadmissible in evidence and which the solicitor-general well knew was inadmissible in evidence, and, as movant contends, same was an effort on his part to get before the jury matters which were inadmissible in evidence, in an effort to nullify and render of no, or less, effect the attack previously made upon the character of the witness, J. H. Holmes, by the introduction of the record of a former conviction of the said Holmes for an offense involving moral turpitude; and movant insists that the statement of the solicitor-general aforesaid did have such effect, and that the court erred in allowing the solicitor-general to make said statement in the presence of the jury, and that the court erred further in not instructing the jury to disregard said statements so made by the solicitor in their hearing. And the movant insists that the court erred in allowing the solicitor-general, after he had begun the direct examination of the said witness, Holmes, to ask if the court would allow him to prove the reasons why the witnesses against the said J. H. Holmes testified as they did upon the trial in which he had been convicted, and the circumstances attending the prosecution. Movant insists that this statement by the solicitor-general, taken in connection with the first statement by him, was tantamount to an assertion that he could prove the reasons the witnesses testified and the circumstances attending the prosecution, and that they were malicious; and movant insists that the court should have instructed the jury to disregard any statement made by the solicitor-general in their presence as to what could or what he wanted to prove by the witness, and movant insists that the court's failure to do so is reversible error, notwithstanding the fact that the court stated to the solicitor that he could not allow him to prove the things he offered to prove."

In the fifth ground of the motion it is alleged that a new trial should be granted because of newly discovered evidence stated as follows: "R. M. Crawford, a hardware merchant of Lyerly, Georgia, will testify in substance as follows: 'The morning after the

night Osburn Holmes was killed by Albert Richardson, J. H. Holmes, who was the witness for the State upon the trial of the above-stated case, came into the store of said Crawford, and the said J. H. Holmes stated to the said Crawford that there had been a difficulty between him and the movant, Albert Richardson, and that the said Albert Richardson shot at him while he, Holmes, was sitting on the bed holding a baby; that the first shot did not take effect, and that at the time the first shot was fired the said Osburn Holmes was in the kitchen at the rear of the room that Richardson and J. H. Holmes were in, and that after the first shot the deceased ran in the room and ran between J. H. Holmes and Albert Richardson just as Richardson fired the second shot at J. H. Holmes; and the said J. H. Holmes then and there stated that Richardson was not shooting at Osburn Holmes, but at witness, J. H. Holmes.' All of which is set out in affidavit of R. M. Crawford," attached to the motion and properly supported by affidavits. "Also the newly discovered evidence of F. A. Williams Sr., which is in substance as follows: 'That on the morning after the alleged killing of Osburn Holmes by Albert Richardson, the said Williams heard the latter part of a conversation between J. H. Holmes, who was a witness for the State on the trial of the above-stated case, and who was the father of Osburn Holmes, and R. W. Bagley and Claude Bagley, in which he related the details of the tragedy; and that he asked the said J. H. Holmes if the killing of Osburn was an accident, to which the said J. H. Holmes replied, 'Yes, sir, Albert Richardson was not shooting at Osburn, but was shooting at me.' All of which appears from the affidavit of said Williams," attached to the motion and properly supported. "And also the newly discovered evidence of R. W. Bagley and of Claude Bagley, which is in substance as follows: That they had a conversation with State's witness J. H. Holmes, the morning after the tragedy, in which Holmes stated that Richardson was not shooting at deceased but was shooting at him (Holmes)," all of which appears from the affidavits of said parties, which are properly supported. "Movant contends the newly discovered evidence disclosed by the affidavits of these parties above referred to is not cumulative, and it is not merely impeaching in its nature, though it would impeach J. H. Holmes, who was in effect the principal witness for the State, in his statement that he was not present in the room

when the second shot was fired and that he did not see it. Movant contends it would change the whole complexion of the case, as the theory of the prosecution was that the killing of Osburn Holmes was premeditated murder upon the part of Albert Richardson, and, in an effort to supply motive where none existed, J. H. Holmes testified upon the trial of the case as follows : 'Q. Was anything said at that time, anything? A. We just sat out there ; later on he got to rearing and cussing, when he seed this boy [referring to the deceased] looked like it give him the fidgets, and he reared and cussed,' but this is not the statement of the witness, J. H. Holmes, on the morning after the difficulty."

. *J. M. Bellah* and *John D. & E. S. Taylor,* for plaintiff in error.

*George M. Napier, attorney-general, J. F. Kelly, solicitor-general,* and *T. R. Gress, assistant attorney-general,* contra.

RUSSELL, C. J., dissenting. 1. In the headnotes I have expressed the opinion of the majority of the court; but as I can not agree to the rulings in the first and third headnotes, I can not concur in the judgment of affirmance. I am of the opinion that the judge erred in overruling the motion for a new trial, and that the accused is entitled to have a trial in which there will be no such expressions by the court as are complained of in the first and second special grounds of the motion for a new trial, and a trial without such conduct on the part of the counsel for the State as is referred to in the third headnote. One accused of crime is entitled to a trial in which there can be no doubt as to whether the verdict was affected by untoward incidents such as would usually be prejudicial in less important matters than the issue of life or personal liberty. Upon the same theory upon which it has been held that while dissevered excerpts from a charge, considered apart from their context, may seem to be erroneous, when in fact the charge considered as a whole, including the portions of which complaint is made, is obviously free from error, so, conversely, my experience has convinced me that in many cases it has happened that though perhaps no single assignment of error considered by itself alone would require a reversal of a judgment refusing a new trial, because under the rules of jurisprudence the act or ruling, without more, of which complaint is made is not deemed necessarily prejudicial, nevertheless, when one matter which would not of itself compel a new trial (though it can not be denied that the trial would have

been more regular had it not occurred) is followed by another and another of the same kind, it is apparent, considering all of the irregularities together, that an atmosphere was created in which a feeling of impartiality could not survive. It was this thought that led Bleckley, Chief Justice of all Georgia judges, past, present, and prospective, to remark, in a case of the nature to which we have referred, that he did not like the complexion of the case, and to adjudge that a real, fair trial should be had. It is my opinion that when the learned trial judge, in ruling upon the objection of the solicitor-general to allowing a witness to testify who had been present while other witnesses testified, although the witnesses had been ordered to be sequestered and had been sent beyond the hearing of the court, instead of ruling directly upon that proposition, addressed to counsel for the defendant the remark, "Well, go ahead and use him; you seem to be fishing anyhow," it would be evident to the solicitor-general that the court was of the opinion that in overruling the objection of State's counsel he was doing no injury to the State, for the reason that there was only a possibility that there would be any evidence to come from that witness which would counteract the case already made in behalf of the State. And the use of the word "anyhow," in concluding the remark, to my mind contains a pregnant intimation to one unlearned in the law that the court might have sustained the objection of State's counsel unless he had been of the opinion that the evidence would be unimportant, and therefore the use of the language, "Well, go ahead and use him; you seem to be fishing anyhow," would likely give the impression that the judge, though not intending to convey any opinion, was really of the opinion that the defendant ought to be convicted. He admits the testimony upon the ground that it is not likely that any testimony in behalf of the defendant can be secured, and that defendant's counsel is himself aware of the hopelessness of his case and for that reason has gone to fishing, as the common expression is among lawyers when counsel does not know what a witness will testify, and yet is in such straits for testimony that he is willing to try any resource. I am of the opinion that the expression comes clearly within the inhibition of section 4863 as an intimation of opinion upon the evidence; but under the principle above referred to it certainly must be doubtful whether it was not or could not

have been so construed. If the jury could have been impressed (and not because it is certain that they were impressed) with the idea that the trial judge thought the guilt of the accused had been established, it is my opinion that the doubt should be resolved in favor of one accused of a heinous crime, though perhaps in a particular case, and if standing alone, the error might not require the grant of a new trial.

2. But during the examination of the same witness that the court permitted to testify because the defendant's counsel was only "fishing anyhow," and when he had answered that he had found certain injuries on the defendant's ankles and legs, and defendant's counsel had elicited from the witness an answer that this could have been caused by falling through the porch or flooring, something like that, and the solicitor-general moved to rule out the answer of the witness because it had "absolutely no connection with the case—there is no proof that this injury was caused by him falling through a hole in the floor or any other hole that he fell through," the court did not rule upon the objection at all. Instead he asked the witness a question, "Did you say he had an abrasion on both legs," to which the witness replied, "Yes, sir." The court has the right to ask witnesses questions. The defendant was contending that his left foot was caught in a small hole on the porch, thus causing an accidental discharge of the gun. It seems to me that it was possible and probable that when the court, instead of ruling upon the objection made by the solicitor-general, turned to the witness and proceeded to call attention to the fact that the defendant had an abrasion on both legs, as and when he did, tended necessarily to impress the jury that the court was of the opinion that the defense of accidental shooting was manufactured. Many men sit upon juries to whom such service is not unusual, and ordinarily expect to hear the court rule upon objections to testimony. The defendant had no testimony that he was injured by falling through a hole, and to that extent the objection of the solicitor-general was correct; but the defendant had made a statement in which he stated that by reason of one of his feet getting caught in the hole, and this causing him to fall, the gun was accidentally discharged. The court, instead of ruling upon the objection made by State's counsel, which it seems he would naturally have had to overrule, because the credibility of the defend-

ant's statement is as much subject to the consideration of the jury in attempting to reach the truth of the case as all or any part of the sworn testimony, proceeded to prove by the witness that he had an abrasion on both legs. I do not mean to say that the court has not the right to ask questions of the witnesses; but it must be a matter of doubt whether, in asking the particular question under the circumstances set forth in the record, the jury was not impressed that the court felt that it was his duty to establish by this witness that the story of falling through the hole was manufactured. It may be that this expression would not of itself require the grant of a new trial; but this circumstance transpired on the heels of that of which complaint is made in the first ground. It was a departure from the usual procedure of a presiding judge; and can we be sure that it worked no prejudice to the defendant— that it did not diminish his right to an impartial trial?

3. Conceding, but not deciding, that the court did not err in omitting to charge the law of manslaughter as contained in section 64 of the Penal Code, I am of the opinion that the court should have sustained the fourth special ground of the motion for a new trial. It is perfectly plain that the solicitor-general was trying to get to the jury evidence which he well knew was inadmissible. I say well knew, because, not only is the able solicitor-general well learned in the law, but the court had ruled that testimony as to the contention of the State's leading witness as to the reasons why he had been convicted of incest, as derived from witnesses who had said they were sorry they had testified against him, was inadmissible. And yet, as appears from the statement certified in the motion for a new trial, the court permitted the solicitor-general to indirectly bring this matter to the attention of the jury three different times, though under the rules of court the act of State's counsel placed him in contempt of court as proceeding in direct opposition to its ruling, and attempting, after the court's decision, to invoke another ruling. The court took no notice of the transgression, though defendant's counsel repeated his objection. In my opinion this could not have failed to be prejudicial to the accused; but even if it was not certainly prejudicial, who can certainly say that it was not? Therefore, in the doubt as to whether it was not prejudicial, the defendant should be accorded a trial free from such an incident, almost unparalleled in our records.

4. The evidence showed that the accused killed his brother-in-law in attempting to shoot the father of the deceased; the father-in-law of the accused; and the State's case largely depended upon his testimony. A quarrel arose about the accused giving whisky to a child of his wife. The evidence showed that this child was probably the offspring of incestuous relations between this State's witness and his daughter, the wife of the accused; for there was introduced in evidence the verdict of a jury in Walker County, finding the father guilty of incest with this daughter. Quite a volley of words were passed between the accused and the State's witness, and after the deceased (son of the witness) came upon the scene he was shot by the accused and instantly killed. The issue in the case was whether the accused would have been justified if he had killed the witness, or whether the killing of the witness would not have been justifiable. The defendant claimed that the killing was accidental; and that though he had been compelled by his fear of his father-in-law to run from the house and was attempting to find safety in flight, and though he had a loaded gun in his hand, he would not have shot as and when he did had not his foot slipped into a hole in the floor of the porch, which caused the gun to fire while his hand was upon the trigger merely as a precaution looking to the use of the weapon in self-defense if it should become absolutely necessary. The jury would have been fully authorized to have acquitted the defendant if they believed his statement. His defense depended solely upon his statement, and for that reason it was peculiarly important to his right to a fair trial that his credibility should not be disparaged in any other way than that provided by law, and certainly not by any conduct or circumstance which might lead the jury to the conclusion that the court thought he was guilty.